# HART, NININGER AND CAMPBELL ASSOCIATES, INC. *v.* STEPHEN L. ROGERS ET AL.
## (5436)

BIELUCH, STOUGHTON and NORCOTT, Js.

Argued April 21—decision released October 4, 1988

*Paul P. DeLuca,* with whom, on the brief, was *Peter N. Buzaid,* for the appellants (defendants).

*James K. Robertson, Jr.,* for the appellee (plaintiff).

NORCOTT, J. The defendants appeal from the trial court's award of monetary damages and injunctive relief arising from the defendants' breach of contract. The defendants claim that the trial court erred (1) in concluding that the court had personal jurisdiction over each defendant, (2) in ruling that the defendant Timothy B. Leonard breached his individual agreement with the plaintiff, (3) in holding each defendant jointly and severally liable for the damages, (4) in both finding and assessing monetary damages and in imposing an injunction as relief for the same injury, (5) in finding monetary damages in the amount of $60,000, (6) in finding that the noncompetitive postemployment restrictive covenant set forth in the employment agreements was reasonable and enforceable, and (7) in rendering a default judgment against the defendant Stephen L. Rogers. We find no error.

The trial court found the following facts. Since 1967, the plaintiff, Hart, Nininger and Campbell Associates, Inc. (HNC), has been a manufacturer's representative. HNC, a Connecticut corporation with its principal office in Woodbury, represented eleven "principals" including Quick Plastics (QP), Plainfield Tool and Engineer-

ing, Inc. (PTE), Plainfield Molding, Inc. (PMI), MidAmerican Rubber (MAR) and Johnson Brass and Machine Foundry, Inc. (JBM). HNC operated within the defined geographical area of New England and portions of New York and New Jersey. As representative of these principals, HNC contacted customers to purchase certain specialized products manufactured by the principals. The selling process involved (1) obtaining quotes on prices, (2) bidding on pieces, parts and prices, (3) obtaining orders from the customers, (4) submitting samples to the principals, (5) processing changes in orders, (6) placing orders, and (7) finalizing orders.

The products sold through HNC's efforts were specialized and were designed according to the unique needs of the particular customer. HNC was paid on a commission basis only when an actual shipment of products was made. A customer was at liberty to cancel any order prior to the actual shipment in which case the plaintiff received no commission for its efforts. There was often a substantial time lag between the initial placement of an order and the production and shipment of the resulting product.

HNC operated through a sales force which in July, 1985, consisted of four full-time sales representatives: HNC president, John Campbell, and the defendants Rogers, Leonard and Teresa Murray. The plaintiff had hired Rogers, then and now a resident of Maine, on August 31, 1981; Murray, presently a resident of New York and then a resident of New Jersey, on September 19, 1981; and Leonard, then and now a resident of New York, on September 7, 1982. None of the defendants has ever been a resident of Connecticut. Each of the defendants operated in different areas of the HNC territory. Each had been trained by Campbell and provided with HNC's confidential information regarding the principals and lists of existing and poten-

tial customers whom Campbell and others had developed since 1967.

The confidential information disclosed to the defendants was regarded as such a valuable business asset that the plaintiff required some protection from postemployment competition by HNC sales representatives. Accordingly, as a condition of employment, each defendant entered into a written restrictive noncompetitive agreement with HNC protecting HNC from his or her postemployment competition.

During 1984 and 1985, HNC lost money. The court found that in July, 1985, Campbell tried to meet with the defendants to review HNC's economic status and problems and to discuss possible solutions. The court also found that while Campbell was attempting to arrange a meeting of all the parties, the defendants were avoiding such a meeting because they were seeking their own representation of HNC's clients. As evidence of these plans, the court found that certain taped telephone messages, taken from defendant Leonard's answering machine, were most damning. These taped messages tracked the progress of the defendants' efforts to solicit HNC clients and to form their own new business as manufacturers' representatives.

Subsequent to an unproductive meeting with Campbell on July 31, 1985, the defendants terminated their employment with HNC. Immediately thereafter, three HNC principals, PMI, MAR and QP, terminated their business relationships with HNC as a result of the solicitation and inducement by the defendants. The defendants Murray and Rogers, pursuant to their plan, quickly formed Northeast Sales Associates, Inc. (Northeast), which then began to represent PMI, MAR and QP, all former HNC clients. The court also found that Murray, as a Northeast employee, continued to cover

the same northern New Jersey and metropolitan New York area that she had covered for HNC.

The trial court found that the defendants breached their individual agreements with HNC and, more particularly, that "the defendants combined, cooperated and consulted with each other in their efforts to solicit and induce HNC's clients to allow the defendants individually, instead of HNC, to be their sales representatives." The court rendered judgment against each defendant "individually and jointly" for $60,000 for the loss of commissions caused by the defendants' breach and also granted injunctive relief to protect HNC from the defendants' violation of the restrictive postemployment noncompetitive agreements. From this judgment, the defendants now appeal.

## I

The defendants, nonresidents of Connecticut, first claim that the trial court erred in finding in personam jurisdiction over them under General Statutes § 52-59b.[1]

---

[1] General Statutes § 52-59b provides in pertinent part: "JURISDICTION OF COURTS OVER NONRESIDENTS AND FOREIGN PARTNERSHIPS. SERVICE OF PROCESS. (a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual, or foreign partnership, or his or its executor or administrator, who in person or through an agent: (1) Transacts any business within the state; or (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or (4) owns, uses or possesses any real property situated within the state."

The analysis of the defendants' challenge to personal jurisdiction involves a two-part inquiry. The first inquiry is whether the applicable state long arm statute authorizes the assertion of jurisdiction over the defendants; and, if the statutory requirements are met, whether the exercise of in personam jurisdiction would violate constitutional principles of due process. *Frazer v. McGowan,* 198 Conn. 243, 246, 502 A.2d 905 (1986); *United States Trust Co. v. Bohart,* 197 Conn. 34, 38–39, 495 A.2d 1034 (1985); *Zartolas v. Nisenfeld,* 184 Conn. 471, 473–78, 440 A.2d 179 (1981). The plaintiff must show that the defendants' purposeful Connecticut related activity demonstrates "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945). Furthermore, the plaintiff bears the burden of establishing an adequate factual basis for personal jurisdiction over the defendants. *Standard Tallow Corporation v. Jowdy,* 190 Conn. 48, 53–54, 459 A.2d 503 (1983).

Under General Statutes § 52-59b, in personam jurisdiction over a defendant may be maintained as long as he "transacts any business" in this state. Although that section does not define the term "transacts any business," our Supreme Court, in *Zartolas v. Nisenfeld,* supra, 474, construed the term "to embrace a single purposeful business transaction." In *Zartolas,* the Supreme Court "eschewed 'resort to a rigid formula' in resolving the transaction of business in Connecticut but rather determine[s] it upon a balance of 'consideration of public policy, common sense, and the chronology and geography of the relevant factors.' Id., 477." *Rosenblit v. Danaher,* 206 Conn. 125, 140, 537 A.2d 145 (1988).

Measured against these standards, we conclude that the trial court did not err in finding in personam juris-

diction. Our review first reveals that the court properly found that there was a statutory basis under § 52-59b for the assertion of personal jurisdiction over the defendants. The plaintiff's principal office was located in Connecticut, and each defendant came to Connecticut to negotiate and sign his individual employment contract. Thereafter, the defendants came to Connecticut to attend quarterly business meetings pertaining to their employment with HNC. It was also undisputed that they kept in telephone contact regularly with the HNC Connecticut office. Furthermore, the defendants filed with HNC weekly activity report sheets which documented the business transacted on behalf of this Connecticut corporation. Additionally, all of the defendants' business account expenses were sent to the Connecticut office for payment, and the defendants' payroll checks were drawn on a Connecticut bank and were mailed to the defendants from this state. Finally, the HNC automobiles, of which the defendants Rogers and Murray had use, were registered in Connecticut. From these facts, the trial court concluded that the defendants' purposeful Connecticut related activity demonstrated certain minimum contacts with this state. See *Computer Assistance, Inc.* v. *Morris,* 564 F. Sup. 1054 (D. Conn. 1983); see also *Rosenblit* v. *Danaher,* supra. We agree.

The next inquiry focuses on whether the exercise of personal jurisdiction violated principles of constitutional due process. The trial court concluded that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." We take this to mean that the court found that the exercise of personal jurisdiction met with the constitutional requirements of due process. We again agree with the trial court.

"The twin touchstones of due process analysis under the minimal contacts doctrine are foreseeability and fairness. '[T]he foreseeability that is critical to due pro-

cess analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.' " *United States Trust Co.* v. *Bohart,* supra, 41, quoting *World-Wide Volkswagen Corporation* v. *Woodson,* 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980).

From the facts of this case, it is not difficult to conclude that the defendants should have foreseen the potential of defending this case in the Connecticut courts. Even though the employment contracts were silent as to an agreed upon forum for litigation arising from the contracts, we cannot ignore the many business related contacts these parties had with this state. In this case, personal jurisdiction was not granted "in such a way as to make litigation 'so gravely difficult and inconvenient' that a party unfairly is at a 'severe disadvantage' in comparison to his opponent." *Burger King Corporation* v. *Rudzewicz,* 471 U.S. 462, 478, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

We note that this case was tried to the court by able counsel and that all of the defendants' claims at trial were fully litigated. In light of this entire record, the trial court did not err in concluding that fairness and due process were not violated by the exercise of personal jurisdiction over the defendants. Accordingly, the defendants' first claim of error must fail.

## II

The second claim of error is that there was insufficient evidence for the trial court to conclude that the defendant Leonard breached his individual agreement with the plaintiff. We find that this claim is without merit.

We begin by noting that we limit our review of this claim to determine whether the trial court's legal and factual conclusions are supported by the facts stated

in the court's memorandum of decision and whether the subsidiary facts themselves are supported by the evidence. *Transportation Plaza Associates* v. *Powers,* 203 Conn. 364, 378, 525 A.2d 68 (1987). On appeal, we determine only whether in light of the evidence in the whole record, the court's decision was clearly erroneous. We will not retry the facts. *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

The essence of the trial court's conclusion that the defendant Leonard breached his individual contract with the plaintiff involves the tape recorded messages of defendants Murray and Rogers that were left on Leonard's telephone answering machine. Leonard's voice could not be heard on the tapes, and it is clear from the record that Leonard never joined the other defendants in any other business activity after they left HNC. Also clear from the tapes, however, is the fact that Murray and Rogers implicated Leonard and chronicled his role in a scheme to leave HNC and solicit HNC principals away from that concern in violation of their employment agreements. Whether Leonard breached his individual agreement with HNC was a matter of circumstantial evidence at trial. Leonard did not testify. From the evidence before it, the trial court could reasonably have drawn the inference that Leonard was involved in a scheme that ultimately led to the breach of his contract with HNC. "Courts necessarily rely upon circumstantial evidence and are entitled to draw reasonable and logical inferences from all the facts." *Monroe* v. *Crandall,* 3 Conn. App. 214, 220, 486 A.2d 657 (1985). This claim of error too must fail.

### III

The defendants' third claim of error is that the trial court erroneously held each defendant jointly and severally liable for the monetary damages of $60,000. We disagree.

The defendants' principal contention is that the court found that the defendants breached their individual contracts with the plaintiff and that this finding only permitted it to impose damages against each individual defendant severally. This contention is at odds with the record.

We first note that the complaint was in four counts, alleging unlawful interference with contractual relations,[2] breach of contract, promissory estoppel, and willful, wanton or malicious conduct respectively. Thus, the plaintiff's complaint stated causes of action in both contract and tort and, absent a conflict between the rules of contract and tort, the plaintiff was allowed to proceed in both. See *Stowe* v. *Smith,* 184 Conn. 194, 199, 441 A.2d 81 (1981).

Notwithstanding the broad language of the court's memorandum of decision, it is clear from the record that the trial court found that the plaintiff had prevailed on both the tortious interference and breach of contract claims.[3] In addition to finding that the plaintiff had lost commissions because of "the defendants' breach of the restrictive postemployment noncompetitive provisions of their contracts" the court made the following finding of fact: "After receiving and considering all of the evidence, I am persuaded that the defendants have breached their individual agreements with HNC. Particularly significant are the tape recorded messages of the defendants Rogers and Murray to the defendant Leonard. These messages show persuasively that the

---

[2] We take the allegation in this count to be synonymous with a claim of tortious interference with a contractual relationship.

[3] The court's memorandum of decision provides, in pertinent part, as follows: "Thus, I find that as a result of HNC's *loss of commissions* caused by the defendants' breach of the restrictive postemployment noncompetitive provisions of their contract with HNC, that HNC has suffered damages in the amount of $60,000. Judgment may enter against each defendant individually and jointly for sixty thousand ($60,000) dollars."

defendants combined, cooperated and consulted with each other in efforts to solicit and induce HNC's clients to allow the defendants individually, instead of HNC, to be their sales representative." We conclude that these findings constitute a finding of "tortious interference" and that this finding was adequately supported by the evidence.

The elements of tortious interference are the existence of a contractual or beneficial relationship, the defendants' knowledge of that relationship, the intent to interfere with it, and the consequent actual loss suffered by the plaintiff. *Solomon* v. *Aberman,* 196 Conn. 359, 383, 493 A.2d 193 (1985); *Harry A. Finman & Son, Inc.* v. *Connecticut Truck & Trailer Service Co.,* 169 Conn. 407, 415, 363 A.2d 86 (1975). From our review, we find that each and every element of tortious interference was proven by the plaintiff and so found by the court. To conclude that the trial court simply found that the defendants breached their individual contracts with the plaintiff is to do injustice to the evidence and to the trial court's articulate memorandum of decision. Concluding, as we do, that the court properly found for the plaintiff on the tortious interference count, we next examine whether the award of joint and several liability was erroneous.

"Connecticut follows the principle stated in § 876 (a) of the Restatement (Second) of Torts, on joint and several liability: ' "Where two or more persons unite in an act which constitutes a wrong to another, intending at the time to commit it, or in doing it under circumstances which fairly charge them with intending the consequences which follow, they incur a joint and several liability for the acts of each and all of the joint participants." ' *Lamb* v. *Peck,* 183 Conn. 470, 472, 441 A.2d 14 (1981), quoting *Gutowski* v. *New Britain,* 165 Conn. 50, 54, 327 A.2d 552 (1973); see *Sparrow* v. *Bromage,* 83 Conn. 27, 28, 74 A. 1070 (1910). If the

evidence indicates that all defendants acted intentionally and in concert, each defendant will be vicariously liable for the entire injury to the plaintiff." *Miles* v. *Perry,* 11 Conn. App. 584, 608, 529 A.2d 199 (1987).

The trial court heard the evidence and found that the defendants acted in concert to bring about certain intended actions. The court held all of the defendants jointly and severally liable. We find that the court's conclusions are clearly supported by the record. The evidence is unmistakably clear that the defendants jointly orchestrated the solicitation and inducement of the plaintiffs' clients in violation of the noncompetitive covenants. It is also uncontroverted that defendants Rogers and Murray formed a new business, some of the operations of which clearly violated the same covenants. We conclude that the trial court's findings, which underlie its holding of joint and several liability, are not clearly erroneous. See id., 609.

IV

The defendants' next claim of error is that the trial court improperly awarded both monetary damages and injunctive relief against them as redress for the same injury.

In each of the defendants' employment contracts with HNC, the defendants had agreed "that the breach by him of this Agreement cannot reasonably or adequately be compensated in damages in an action of law and that the Company shall be entitled to injunctive relief to enforce its terms. Nothing contained in this paragraph, however, shall prohibit the Company from pursuing other legal or equitable relief which may be available to it for a breach of any provision of this Agreement." The rationale behind this provision was that HNC was engaged in a peculiarly specialized business which had been founded on years of the plaintiff's goodwill and confidential trade information. HNC stood to suffer

substantial harm from an unscrupulous former employee, trained and given access to HNC's confidential information, who might breach the contract and compete with HNC to the latter's detriment.

The trial court found that, as a result of the breach, the plaintiff suffered, and would continue to suffer, irreparable harm for which there was no adequate remedy at law. Accordingly, the court ordered injunctive relief on behalf of the plaintiff. By virtue of the injunctive relief, each defendant was (1) enjoined from any competitive work activity previously prohibited under the employment agreements, (2) subjected to the injunction for a period of two years, (3) ordered to render an accounting of all monies received by them from the HNC principals listed in the injunction at the end of the second year of the injunction, and (4) ordered to pay a penalty of $1000 for each violation of the injunction.

The court also awarded the plaintiff monetary damages for the loss of commissions that the plaintiff would suffer in the future because of the breach of the contracts.[4] The award of monetary damages for the loss of future earnings covered the same two year time period as set forth in the injunctive relief, namely, July 31, 1985, until August 1, 1987. The last significant aspect of the monetary award was that the court limited the award to prospective losses from just three companies, MAR, QP and PTE/PMI, joined in the court's memorandum of decision as the "Plainfield Companies."

[4] The trial court also found that individual specific damages of $266.89, $156.31 and $1357.60 were due the plaintiff from the defendants Rogers, Murray and Leonard respectively. These damages covered items such as an unreturned telephone answering machine, unreturned balances of expense advances, charges for personal items billed to HNC, and the balance on a promissory note executed by Leonard. The defendants do not challenge these awards of additional damages, and, accordingly, they are not the subject of this appeal.

The crux of the defendants' argument is that the award for monetary damages alone was full and complete compensation for any injury that the plaintiff suffered and that injunctive relief was unnecessary, duplicative and an abuse of the trial court's discretion. We are not persuaded by this argument.

"The granting of injunctive relief is within the trial court's discretion. In exercising this discretion, the court must balance the competing interests of the parties; *Berin* v. *Olson,* 183 Conn. 337, 343, 439 A.2d 357 (1981); and '[t]he relief granted must be compatible with the equities of the case.' *Dupuis* v. *Submarine Base Credit Union, Inc.,* 170 Conn. 344, 356, 365 A.2d 1093 (1976)." *Dukes* v. *Durante,* 192 Conn. 207, 225, 471 A.2d 1368 (1984). In the present case, the parties themselves recognized the need for injunctive relief in the event of the defendants' breach and expressly provided for it. The trial court merely gave effect to the parties intentions to protect the plaintiff from the violative use of its confidential business information. Given the very specialized business involved, the money damages alone would not have protected the plaintiff from future wrongful conduct by the defendants. "A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." *Hartford* v. *American Arbitration Assn.,* 174 Conn. 472, 476, 391 A.2d 137 (1978). We find that the trial court did not err in concluding that the plaintiff had met its burden of proof.

The defendants' next contention, that the two forms of relief granted in this case were unfairly duplicative, is also untenable. "The fact that the court awarded damages does not preclude the plaintiff from recovering injunctive relief." *Berin* v. *Olson,* supra, 342; see also *Taylor* v. *Conti,* 149 Conn. 174, 180–81, 177 A.2d 670 (1962). Here, the trial court awarded the plaintiff money damages and injunctive relief to cover two very

distinct situations, namely, the loss of future commissions and the protection against further harmful competitive business activity. These awards were well within the proper discretion of the court, and we will not disturb them on appeal. *Connecticut Light & Power Co.* v. *Holson Co.,* 185 Conn. 436, 440, 440 A.2d 935 (1981); *Lichteig* v. *Churinetz,* 9 Conn. App. 406, 412, 519 A.2d 99 (1986).

## V

The defendants' next claim is that the trial court's award of $60,000 in monetary damages was speculative and unsupported by the evidence. This claim is also without merit.

The trial court's memorandum of decision was very specific as to money damages. The court found that, because of the defendants' breach, the plaintiff would suffer the loss of commissions yet to be realized. The court calculated the value of the prospective lost commissions on the basis of past profits and commissions earned by HNC. These calculations were based on (1) the actual amount of commission dollars paid to the plaintiff by each former principal during the two years prior to the breach, (2) the principals' statements regarding the value of expected profits and commissions for the coming years, (3) the statements made to HNC by purchasers of the principals' products with respect to purchasing levels for the coming years, (4) the monthly and quarterly sales projections of the defendants themselves, and (5) the estimates of Campbell, HNC's president, who had many years of experience in his field of business. The court's calculations were complex but well documented. "That damages may be difficult to assess is, in itself, insufficient reason for refusing them once the right to damages has been established. See *Ball* v. *T. J. Pardy Construction Co.,* 108 Conn. 549, 551, 143 A. 855 (1928)." *Griffin*

v. *Nationwide Moving & Storage Co.,* 187 Conn. 405, 420, 446 A.2d 799 (1982).

On the basis of the evidence before it, the trial court calculated the loss of the plaintiff's future commissions to be $60,000 from July 31, 1985, until August 1, 1987. "Prospective damages are recoverable if they are reasonably certain to occur"; *Neiditz* v. *Morton S. Fine & Associates, Inc.,* 2 Conn. App. 322, 328, 479 A.2d 249 (1984), rev'd in part, 199 Conn. 683, 508 A.2d 438 (1986); and " 'whenever their loss relates directly from and as a natural consequence of the breach.' " *West Haven Sound Development Corporation* v. *West Haven,* 201 Conn. 305, 320, 514 A.2d 734 (1986). The trial court here had more than sufficient evidence upon which to conclude that the damages were likely to occur and that they stemmed directly from the defendants' breach. The calculation of the award was neither speculative nor subjective, and it allowed for an objective ascertainment of the amount ordered. See *Bronson & Townsend Co.* v. *Battistoni,* 167 Conn. 321, 326–27, 355 A.2d 299 (1974).

The defendants' next argument with respect to this claim of error is that the court erred by not deducting the defendants' expenses and salaries from the $60,000 money damages award. This argument requires little discussion.

To accept the defendants' argument would be to ignore the method of realizing commissions which was peculiar to HNC's business. HNC paid its sales representatives at the front end of its operational scheme for work they did in matching HNC's principals with purchasers. The court's projection of lost commissions necessarily disregarded the expenses and salaries *already* paid to the defendants. To deduct these items would be tantamout to a reward to the defendants for their breach. This the trial court properly refused to

do. " '[W]e cannot disturb the court's finding as to the amount of damages unless it appears that the court unreasonably exercised the large discretion necessarily vested in it and awarded damages so excessive as to be unreasonable and to amount to an injustice. . . .'" *Dunstan* v. *Round Hill Dairy, Inc.,* 128 Conn. 300, 302–303, 22 A.2d 631 (1941)." *Monroe* v. *Crandall,* 3 Conn. App. 214, 221–22, 486 A.2d 657 (1985). We find no abuse of the court's discretion in assessing monetary damages at $60,000.

## VI

The defendants' sixth claim of error is that the trial court erred in finding that the postemployment noncompetitive restrictive covenants were reasonable and enforceable. We disagree.

The facts relevant to this claim are undisputed. The employment agreement of each defendant included a restrictive noncompetitive covenant that was expressly intended to protect the "confidential trade and business practices and information" and "trade secrets" of the plaintiff.[5]

Noncompetitive or restrictive covenants between an employer and employee usually occur when an employer is trying to protect his trade secrets, customer lists or territory. " 'Under the common law, the well-settled rule is that an anticompetitive covenant ancillary to a lawful contract is enforceable if the

---

[5] The noncompetitive covenant provided: "Employee further agrees that during his employment with the Company and for a period of two years after the termination thereof, he will not directly or indirectly for his own account or as an employee, stockholder, director, officer or consultant of another anywhere engage in any enterprise or business in the Company's Territory competitive with any business now or hereafter carried on by the Company during the term of his employment and that he will not solicit or attempt to represent or do business with any of the principals represented by the Company or customers to whom the Company sells with respect to competing or complementary product lines."

restraint upon trade is reasonable.' " *New Haven Tobacco Co.* v. *Perrelli,* 11 Conn. App. 636, 638, 528 A.2d 865 (1987).

Other jurisdictions have enforced noncompetitive agreements only when necessary to prevent the disclosure of confidential information or when the employee's services are unique or extraordinary. See *Rigging International Maintenance Co.* v. *Gwin,* 128 Cal. App. 3d 594, 180 Cal. Rptr. 451 (1982); *Scott Paper Co.* v. *Finnegan,* 101 App. Div. 2d 787, 789, 476 N.Y.S.2d 316 (1984). Our Supreme Court has set out a five-part test for determining the reasonability of a restrictive covenant: (1) the length of time the restriction is to be in effect; (2) the geographical area covered by the restriction; (3) the degree of protection afforded to the interest of the party in whose favor the covenant is made; (4) the restrictions imposed on the employee's ability to pursue his occupation; and (5) the potential for undue interference with the interests of the public. *Scott* v. *General Iron & Welding Co.,* 171 Conn. 132, 137, 368 A.2d 111 (1976).[6]

In this case, the trial court concluded that the noncompetitive agreement was "reasonable and reasonably necessary . . . to protect the interest of HNC." The court found that there was a reasonable relationship between the type of business interests to be protected and the scope of the geographical restrictions.[7] Upon our review of this record we cannot say that the court erred.

---

[6] The defendants do not challenge either the time restriction or the "public interest" interference concern as set forth in *Scott* v. *General Iron & Welding Co.,* 171 Conn. 132, 137, 368 A.2d 111 (1976). We will discuss only those matters challenged by the defendants on appeal.

[7] Further evidence in the record of the reasonableness of the restrictive noncompetitive covenant is found in the fact that Northeast was successful in attracting its own client, American Optical Company, which was not affected by the covenant, since it was neither a principal of HNC, nor a competitor of its principals.

The defendants' challenge to the court's finding is a factual one. They contend, in essence, that the trial court erroneously found that the geographical restrictions set forth in the employment agreements were not unreasonably broad.[8] Our review leads us to conclude that the defendants would have us retry the facts relevant to this claim. "Our review of the trial court's factual findings is limited solely to the determination of whether they are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, they are clearly erroneous. . . . The function of an appellate court is to review, and not retry, the proceedings of the trial court." (Citations omitted.) *Petti* v. *Balance Rock Associates,* 12 Conn. App. 353, 357, 530 A.2d 1083 (1987).

We find that the court correctly applied the relevant law to the evidence and did not err in concluding that the restrictive covenant was reasonable and enforceable.

## VII

The final claim of error relates to the defendant Rogers. The claim is that the trial court erred in rendering a default judgment against Rogers for failing to appear in the absence of a military affidavit.

On April 3, 1986, two months following the service of process on him, pursuant to General Statutes § 52-87,[9] Rogers was defaulted for failure to appear and

[8] We note that the defendant Murray also argues that the restrictive covenant should not be enforceable as against her because she was forced to sign the employment agreement without the benefit of legal counsel. This argument is wholly without merit or support in the record and requires no further discussion.

[9] General Statutes § 52-87 provides: "CONTINUANCE ON ACCOUNT OF ABSENT OR NONRESIDENT DEFENDANT. (a) Every civil action in which the defendant is an inhabitant of this state but is absent from the state at the commencement of the action and continues to be absent until after the return day, without having entered any appearance therein, shall be continued

defend the action against him. At the time the court rendered the default judgment, the plaintiff had not filed a military affidavit pursuant to Practice Book § 353,[10] and the court made no finding of Rogers's military status as required by that rule of practice.

The evidentiary hearing of the present case commenced on February 4, 1986. During that hearing, the defendant Murray testified that Rogers was then currently employed as a manufacturer's representative for one of the plaintiff's former clients, the Plainfield Com-

---

or postponed for thirty days by order of the court. If the defendant does not then appear and no special reason is shown for further delay, judgment by default may be rendered against him.

"(b) If the defendant is not an inhabitant or a resident of this state at the commencement of the action and does not appear therein, the court shall continue or postpone it for three months and may, if it deems further notice advisable, direct such further notice of the pendency of the action to be given to the defendant by publication in some newspaper, or otherwise, as it deems expedient, or may authorize any person empowered to serve process by the laws of the foreign jurisdiction in which the defendant resides to serve upon the defendant a copy of the summons and complaint and of the order of notice. Any such person serving process in a foreign jurisdiction shall make affidavit of his actions concerning the process on the original order of notice. If, upon the expiration of such three months, the defendant does not then appear and no special reason is shown for further delay, judgment may be rendered against the defendant by default. Upon the expiration of the three-month continuance, it shall be presumed prima facie that no special reason for further delay exists. In actions of foreclosure, including prayers for relief incident thereto and part thereof, judgment may then be rendered upon the plaintiff's motion for judgment of foreclosure.

"(c) The provisions of this section shall not apply in the case of any civil action brought under and pursuant to section 47-33 or 52-69, and no continuance or postponement of any such action or additional notice of the pendency thereof may be required unless the court so orders.

"(d) A continuance or postponement under this section shall not be granted or, if granted, shall terminate if actual notice is shown in accordance with section 52-88."

[10] Practice Book § 353 provides: "DEFAULTS UNDER SOLDIERS' AND SAILORS' RELIEF ACT

"An affidavit must be filed in every case in which there is a nonappearing defendant, either (1) stating that such defendant is in the military or

panies and that Rogers was living in Maine and was Murray's current partner in the newly formed Northeast Sales Associates. The trial court heard further testimony from Campbell, president of HNC, that prior to July 31, 1985, Rogers was not in the military but was a full-time employee of HNC.

The defendant Rogers claims as error that the court failed to find that he was not in military service as required by Practice Book § 353. This claim is first raised here on appeal since Rogers neither appeared at trial nor moved to open the default judgment. We will consider Rogers' claim only for the limited purpose of determining whether the claim raises a jurisdictional question that we must address.

Practice Book § 353 implements the Soldiers' and Sailors' Civil Relief Act of 1940, 54 Stat. 1178, as amended, 50 U.S.C. § 520 (1) and (3). "The purpose of that statute is to protect those in the military service against default judgments. A default judgment rendered without a military affidavit is not void but voidable at the instance of a serviceman on a proper showing of prejudice and injury. . . . A default judg-

---

naval service, or that the plaintiff is unable to determine whether or not such defendant is in such service, or (2) setting forth facts showing that such defendant is not in such service.

"If it appears that the defendant is in such service the court shall, and if it is undetermined whether the defendant is in such service or not the court may, appoint an attorney to represent such defendant before judgment is rendered. No such attorney shall have the power to waive any right of the person for whom he is appointed or to bind him by his acts.

"Unless it appears that the defendant is not in such service, the court may require as a condition before judgment is rendered that the plaintiff file a bond approved by the court conditioned to indemnify the defendant, if in military service, against any loss or damage that he may suffer by reason of any judgment should the judgment be thereafter set aside in whole or in part.

"The findings made under the three preceding paragraphs shall be recited in the judgment."

ment may not be challenged on that ground by a person who was not in the military service at the time of its entry." (Citations omitted.) *Ruggiero* v. *Ruggiero,* 35 Conn. Sup. 581, 582–83, 399 A.2d 187 (1978). A voidable default judgment rendered without a finding of a party's military status, therefore, does not rise to the level of a jurisdictional defect. Id.[11]

This result is clearly applicable to the present case where the plaintiff clearly and successfully bore the burden of showing at the hearing that the defendant Rogers was not in the military. Rogers' assignment of error here is without merit.

There is no error.

In this opinion STOUGHTON, J., concurred.

BIELUCH, J., concurring in part and dissenting in part. I disagree with the majority opinion insofar as it finds that the trial court did not err in rendering a judgment upon default against the defendant Stephen L. Rogers. In its rush to judgment, the plaintiff misinterpreted the guiding statute, misconstrued the procedural rules, and led the court into a misjudgment.

On December 31, 1985, the plaintiff obtained a court order requiring the defendants to appear on January 27, 1986, to show cause why a temporary injunction should not issue on its application and verified complaint. The order of service required that the defendants be served on or before January 15, 1986. As the defendant Stephen L. Rogers was a resident of Sebago Lake, Maine, the order of service required that service be made pursuant to General Statutes

---

[11] The *Ruggiero* case also makes it clear that the failure of the court to make in the judgment a recital of the finding of military status does not render the judgment void. See *Ruggiero* v. *Ruggiero,* 35 Conn. Sup. 581, 399 A.2d 187 (1978).

§ 52-59b.[1] The sheriff's return of service shows that on January 9, 1986, he served the secretary of the state, and on the same day he sent a true and attested copy of the pleadings, "postage paid and registered, return receipt requested," to the defendant Rogers, but the requested receipt of delivery was never returned to him to be appended to his return of service. The application for a temporary injunction and order to show cause, the order of service, verified complaint with attached exhibits, and sheriff's return of service were filed in court on January 22, 1986.

The return day of the action was January 28, 1986. Counsel for the defendants Teresa J. Murray and Timothy B. Leonard filed an appearance on their behalf on January 27, 1986. Rogers made no appearance, either by counsel or pro se, when due,[2] or at any time in the trial court. On February 3, 1986, the plaintiff filed an "amendment of complaint as of right." This amendment added counts five, six and seven to the four counts of the original complaint. Of the new counts, the fifth count was directed solely against Rogers. The certification of service required by Practice Book § 123 recited that "a copy of the foregoing was mailed, postage prepaid, this 3rd day of February, 1986, *to all counsel of record.*" (Emphasis added.) There was no counsel of record appearing for Rogers. No order of service was obtained directing the manner of service of the amended complaint upon this nonappearing defendant. There is no record of the service of this amended complaint upon Rogers, and if he was served, the date, place and manner of service.

---

[1] General Statutes § 52-59b (c) provides in relevant part: "The process shall be served by the officer to whom the same is directed upon the secretary [of the state] by leaving with or at the office of the secretary, at least twelve days before the return day of such process, a true and attested copy thereof, and by sending to the defendant at his last-known address, by registered or certified mail, postage prepaid, a like true and attested copy with an endorsement thereon of the service upon the secretary."

[2] "[A]n appearance for a party should be filed on or before the second day following the return day." Practice Book § 66.

The hearing on the temporary injunction application began on February 4, 1986. It continued through February 6, when the parties and the court agreed to continue the hearing to a later trial on the plaintiff's claims for a permanent injunction and damages. During these three days of hearing, evidence, including exhibits, was introduced against the nonappearing defendant, Rogers. Responsive pleadings were thereafter filed by the two appearing defendants, Murray and Leonard, and the issues were joined as to the claims against and by them.

The injunction hearing was resumed on April 2, 1986, combined with the trial for damages. During the identification of the case and of counsel for the record, the court acknowledged that "Mr. Rogers has not appeared in this matter." Thereafter, testimony was resumed at this hearing. On the following day, the plaintiff filed a motion requesting that judgment by default be rendered against Rogers pursuant to General Statutes § 52-87[3] on these representations: "(1) This action was *commenced* by order of service signed by Judge William Lavery on December 31, 1985; (2) The sheriff's *affidavit*[4] indicates that the complaint was served upon

---

[3] General Statutes § 52-87 (b) provides in relevant part: "If the defendant is not an inhabitant or a resident of this state at the commencement of the action and does not appear therein, *the court shall continue or postpone it for three months* and may, if it deems further notice advisable, direct such further notice of the pendency of the action to be given to the defendant by publication in some newspaper, or otherwise, as it deems expedient, or may authorize any person empowered to serve process by the laws of the foreign jurisdiction in which the defendant resides to serve upon the defendant a copy of the summons and complaint and of the order of notice. . . . If, upon the expiration of such three months, the defendant does not then appear and no special reason is shown for further delay, judgment may be rendered against the defendant by default. Upon the expiration of the three-month continuance, it shall be presumed prima facie that no special reason for further delay exists." (Emphasis added.)

Practice Book § 80 tracks § 52-87 (b) in text and requirements.

[4] There is no sheriff's affidavit on file. This is an apparent reference to the sheriff's return of service filed on January 22, 1986, with the original pleadings.

defendant Stephen L. Rogers on January 9, 1986; and (3) More than *three months* have passed since commencement of this action." (Emphasis added.) The required certification of service of this motion for default recited "that a copy of the foregoing was hand delivered this 3rd day of April, 1986, to all counsel of record." Judicial notice may be taken that this motion for default was not served on the defendant Rogers as required by Practice Book §§ 352[5] and 123. Additionally, no military affidavit was filed with the motion for default as required by Practice Book § 353.

At the close of testimony on April 3, 1986, the following occurred: "Mr. Robertson [counsel for plaintiff]: And, the other matter, your Honor, is: I would, before we leave today, also, as a completing matter, I would like a default entered against Mr. Rogers, the ninety days has passed.

"The Court: Has the ninety days passed—

"Mr. Robertson: Yes, your Honor.

---

[5] Practice Book § 352 provides: "(a) If no appearance has been entered for any party to any action on or before the second day following the return day, any other party to the action may make a motion that a nonsuit or default be entered for failure to appear, and, subject to the provisions of Secs. 80, 353 and 366, such motion may be granted.

"(b) It shall be the responsibility of counsel filing a motion for default for failure to appear to serve the defaulting party with a copy of the motion. Service and proof thereof may be made in accordance with Secs. 121, 122 and 123. Upon good cause shown, the court may dispense with this requirement when judgment is rendered.

"(c) Except as provided in Secs. 355 and 362A, motions for default for failure to appear shall be printed on the short calendar. Unless the moving party requests that such a motion be marked off or unless the moving party is also requesting that judgment be rendered immediately after the entry of the default, the court shall grant the motion without the need for the moving party to appear at short calendar, provided the defendant has not appeared and the court is satisfied that proper service has been made and that the requirements of subsection (a) above have been met. A motion for nonsuit for failure to appear shall be printed on the short calendar. If it is proper to grant the motion, the court shall grant it without the need for the moving party to appear at the short calendar."

"The Court:—since service?

"Mr. Robertson: Yes, your Honor, since the commencement of the lawsuit.

"The Court: Since service here. There is a return date.

"Mr. Robertson: The statute, your Honor—

"The Court: I have forgotten now. What does the statute say? It's 52—

"Mr. Robertson: I have it here, your Honor.

"The Court: What is it? I have forgotten now. What does it say?

"Mr. Robertson: The ninety day—

"The Court: I have forgotten now. I am doing short calendar and I am doing the thing all the time.

"Mr. Robertson: Commencement of the action, which is December 31st.

\* \* \*

"The Court: I want to find out: Was the defendant served. All right. This matter was filed—I still need the file to find out when it was filed. This shows when the service was made, on the 9th, of placing in the hands of the secretary of state, when it was filed. Do you have a stamp as to when it was filed?

"Mr. Robertson: I have Judge Lavery's order of service, your Honor, which was the commencement date—

"The Court: That is—

"Mr. Robertson:—dated and signed.

"The Court: That is the date that it is stamped commencement.

"Mr. Robertson: Yes, your Honor. This is the date that he signed it and given the order of notice.

"The Court: All right.

"Mr. Robertson: December 31st, your Honor.

"The Court: The record should show then that this action was commenced on the 31st of December, 1985, and service was made on the defendant, Rogers, through the Office of the Secretary of State on January 9, 1986. You only have three months.

"Mr. Robertson: From December 31st, that is the commencement of the action. Three months and three days—four days.

"The Court: Three months. The action was instituted on the 31st of December, 1985. And, the action was—writ, summons and complaint was placed in the hands of the secretary of state, service on the defendant by subsequent service on January 9, 1986. A motion made, pursuant to General Statute Section 52-87, that this court note for the record that the defendant, Rogers, has not appeared and more than three months have elapsed since the commencement of the action. And, a motion for default has been made.

"The court makes a further finding that a prima facie showing is made, that no special reason for further delay exists since the defendant has not appeared within three months after the commencement of this action. Accordingly, a motion for default is granted.

"Mr. Robertson: Thank you, your Honor."

The default was entered without the filing of a military affidavit by the plaintiff, and without the findings of the court as to military service required by Practice Book § 353. After the default for failure to appear was

entered against the defendant Rogers on April 3, 1986,[6] the injunction and damage hearings continued with the presentation of evidence against all three defendants, including the nonappearing defendant Rogers. On August 15, 1986, the court filed its memorandum of decision, in which it recited that "[t]he defendant Stephen L. Rogers has not appeared in this matter and as a result he has been defaulted." After finding that the defendants had breached their individual employment agreements with the plaintiff, the court issued a permanent injunction enjoining the defendants, under penalty, from further breaches until August 1, 1987. In addition, money damages were assessed against the nonappearing defendant Rogers in the amount of $60,000 jointly and severally with the other defendants, and $266.89 individually.

In its judgment file, "the court [found] that the complaint along with the application for a temporary injunction and an order to show cause were duly served on the defendant Stephen L. Rogers as appears by the affidavit[7] of service attached thereto." The judgment does not recite (1) the continuance of three months required by General Statutes § 52-87 (b) and Practice Book § 80 because of the nonappearance of the non-

---

[6] Our review of the record and transcript discloses that the default for failure to appear was entered against Rogers on April 3, 1986. The defendants' brief incorrectly states that "[t]he court at the plaintiff's request entered a default judgment against the nonappearing defendant Rogers on May 6, 1986." A review of the entire transcript for May 6, 1986, the last day of the trial, reveals that during direct examination of the defendant Teresa J. Murray, counsel for the defendant, objected to a line of questioning concerning the nonappearing defendant Rogers. The court made this evidentiary ruling: "I've allowed you to go into Rogers for a limited extent because of the fact that he has been defaulted. He's not represented here. Leonard is represented here. There's no need for me to allow any questions of whether or not to see whether or not he's here."

[7] See footnote 4, supra. The judgment file was prepared by counsel for the plaintiff and contains the same error previously noted in his designation of the sheriff's return as an "affidavit."

resident defendant Rogers, (2) court findings as to military service required by Practice Book § 353, and (3) the entry of a default against the nonappearing defendant Rogers.

The trial court erred in entering a default against the nonappearing defendant Rogers and in rendering judgment thereon. "[T]here is a clear distinction between a default, sometimes loosely referred to as a judgment of default, and a judgment upon default. A default is not a judgment. It is an order of the court the effect of which is to preclude the defendant from making any further defense in the case so far as liability is concerned. A judgment upon default, on the other hand, is the final judgment in the case which is entered after the default and after a hearing in damages." *Automotive Twins, Inc.* v. *Klein,* 138 Conn. 28, 33, 82 A.2d 146 (1951).

Preliminarily, the plaintiff's amended complaint of February 3, 1986, containing a fifth count against Rogers was not properly filed against him. An amended complaint must be properly served upon a nonappearing defendant to be valid and supportive of a later judgment. Otherwise, there is a lack of notice constituting a basic failure of due process. It was incumbent on the plaintiff under the circumstances then existing to obtain a proper order of service or a citation from the court. Practice Book § 196 provides: "Every motion, request, application or objection directed to pleading or procedure, unless relating to procedure in the course of a trial, shall be in writing and shall, except in the case of a request, have annexed to it a proper order, and a proper order of notice and citation, if one or both are necessary. Such motion, request, application or objection shall be served on all parties as provided in Sec. 120 and, when filed, the fact of such service shall be endorsed thereon."

The hearing on the plaintiff's application for a temporary injunction commenced on February 4, 1986, and continued through February 6, at which time it was suspended until a later date when the request for a permanent injunction and claims for money damages could be heard simultaneously. Evidence, including exhibits, was introduced against the nonappearing defendant Rogers at the initial hearing. That proceeding was premature against Rogers and any evidence adduced against him at that time was improper and could not support any later judgment against him. Under the provisions of General Statutes § 52-87 (b) and Practice Book § 80, a statutory continuance or postponement of the action against the nonresident nonappearing defendant Rogers was then in effect for a period of three months from its commencement. No proceedings against Rogers could take place in that interval, and any action against him then was a nullity.

The plaintiff's motion for default of Rogers for his nonappearance was not served on this defendant as required by the procedural rules, was improperly filed, and was erroneously granted. Practice Book § 352 (b) provides that "[i]t shall be the responsibility of counsel filing a motion for default for failure to appear to serve the defaulting party with a copy of the motion" and to certify such service to the court. That was not done. Practice Book § 352 (c) requires that "motions for default for failure to appear shall be printed on the short calendar" for action by the court. That also was not done.

Of great significance is the fact that this motion for default was filed after the introduction of evidence against Rogers supporting the court's later judgment had begun on February 4, 1986, for three days, and had resumed on April 2, 1986, for two days before the motion was filed, and then was called to the court's attention for a ruling. Most importantly, the statutory

continuance under General Statutes § 52-87 (b) and Practice Book § 80 was still in effect at the time of the filing of the motion and its grant by the court and precluded the entry of the default against Rogers and commencement of the trial itself against him. Since the trial was already in progress, it could then proceed only against the two appearing defendants.

In the case of a nonresident nonappearing defendant, such as Rogers, no default may enter for a period of three months from "the commencement of the action." This is mandated by the statutory continuance required by General Statutes § 52-87 (b) and Practice Book § 80. The plaintiff in its motion for default and in its representation to the court on the hearing of that motion claimed that this action commenced on December 31, 1985, with the signing by a judge of the order of service. That date was before the service of the application of the plaintiff for a temporary injunction and order to show cause, the order of service, and verified complaint upon the nonresident defendant Rogers, through the office of the secretary of the state on January 9, 1986, and the return of those papers to court on January 22, 1986. The plaintiff's claim as to the commencement of the action was a misstatement of the law.

" 'In Connecticut, an action is commenced on the date of service of the writ upon the defendant. *Broderick* v. *Jackman,* 167 Conn. 96, 99, 355 A.2d 234 [1974]; *Seaboard Burner Corporation* v. *DeLong,* 145 Conn. 300, 303, 141 A.2d 642 [1958]; *Consolidated Motor Lines, Inc.* v. *M & M Transportation Co.,* 128 Conn. 107, 109, 20 A.2d 621 [1941]; *Spalding* v. *Butts,* 6 Conn. 28, 30 [1825]; *Jencks* v. *Phelps,* 4 Conn. 149 [1821]; *Clark* v. *Helms,* 1 Root 486 [1793].' " *McGaffin* v. *Roberts,* 193 Conn. 393, 401–402 n.9, 479 A.2d 176 (1984), cert denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985); *Balboa Ins. Co.* v. *Zaleski,* 12 Conn. App. 529, 533, 532 A.2d 973 (1987). The reason for this rule

is that notice, actual or constructive, is the foundation of due process. See *Peralta* v. *Heights Medical Center, Inc.,* 485 U.S. 80, 84, 108 S. Ct. 896, 99 L. Ed. 2d 75 (1988); *Armstrong* v. *Manzo,* 380 U.S. 545, 550, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965); *Fong* v. *Planning & Zoning Board of Appeals,* 16 Conn. App. 604, 614, 548 A.2d 454 (1988); *Park City Hospital* v. *Commission on Hospitals & Health Care,* 14 Conn. App. 413, 424–25, 542 A.2d 326 (1988).

The nonresident nonappearing defendant Rogers was served through the secretary of the state on January 9, 1986. By the calendar, three months from that date was April 9, 1986, six days after the entry of the default by the court on April 3, 1986. In *Associated Transport, Inc.* v. *Batchellor,* 19 Conn. Sup. 285, 111 A.2d 692 (1955), the trial court, on February 21, 1952, entered a default against a nonresident nonappearing defendant upon whom service had been made through the commissioner of motor vehicles pursuant to General Statutes § 7779 (now § 52-26). Several months later, an appearance was made by the defaulted defendant. In December, 1954, a motion was filed to set aside the earlier default. The court set aside the default, stating: "Nowhere does it appear, in the file or elsewhere, that the court on February 21, 1952, when it entered the default in question, had its attention called to the fact that [the defendant] was a nonresident defendant. From all that does appear, such was not the situation. Hence the relevant provision of [General Statutes § 7808 (now § 52-87 (b))] must be deemed not to have been considered and applied. It should have been. Further discussion is not required other than to say that the default of February 21, 1952, must be considered a nullity." Id., 288.

The facts before us are not unlike those presented to the United States Supreme Court in *Peralta* v. *Heights Medical Center, Inc.,* supra. In *Peralta,* the

defendant was served personally with a citation, but the service was late. Under Texas law, a late service deprived the court of personal jurisdiction over the defendant. A default judgment was rendered against him for the amount claimed by the plaintiff. Peralta then brought a bill of review to set aside the default judgment, but the trial court granted summary judgment against him for failure to show that he had a meritorious defense to the action in which the judgment had been entered. The Texas Court of Appeals affirmed, but the United States Supreme Court reversed, holding: " 'An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them the opportunity to present their objections.' . . . Failure to give notice violates 'the most rudimentary demands of due process of law.' . . . As we observed in *Armstrong* v. *Manzo,* supra, [552,] only 'wip[ing] the slate clean . . . would have restored the petitioner to the position he would have occupied had due process of law been accorded to him in the first place.' The Due Process Clause demands no less in this case." (Citations omitted.) *Peralta* v. *Heights Medical Center, Inc.,* supra, 899–900. Due process demands no less from us.